J-S27046-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: L.C., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: G.R., MOTHER | No. 2689 EDA 2014 |

Appeal from the Order entered August 19, 2014,
in the Court of Common Pleas of Philadelphia County, Family
Court, at No(s): CP-51-DP-0001679-2013

| | |
|---|---|
| IN THE INTEREST OF: A.C., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: G.R., MOTHER | No. 2693 EDA 2014 |

Appeal from the Order entered August 19, 2014,
in the Court of Common Pleas of Philadelphia County, Juvenile
Division, at No(s): CP-51-DP-0001680-2013,
FID: 51-FN-003321-2013

BEFORE:  FORD ELLIOTT, P.J.E., STABILE, and FITZGERALD*, JJ.

MEMORANDUM BY FITZGERALD, J.:                **FILED AUGUST 13, 2015**

G.R. ("Mother") appeals from the orders entered in the Court of Common Pleas of Philadelphia County, adjudicating dependent her minor daughters, L.C., born in June of 2011, and A.C., born in April of 2013.[1] Mother challenges the court's findings that both children are dependent and that A.C.'s injuries were the result of physical abuse.  We affirm.

_____

* Former Justice specially assigned to the Superior Court.

[1] The children's father, A.C. ("Father"), took an appeal from the order adjudicating the child A.C. dependent.  We affirmed at *Interest of A.C.*, 2723 EDA 2014 (unpublished memorandum) (Pa. Super. filed Aug. 10, 2015).

The trial court set forth the factual and procedural history as follows.[2]

> On August 3, 2013, [the Philadelphia Department of Human Services ("DHS")] received a Child Protective Services . . . report, which alleged that Mother took A.C., a 4 month old, to St. Christopher's Hospital for Children ("Hospital") because A.C. was bleeding from her mouth. [At this time, L.C. was two years old.] While at Hospital, A.C. received an evaluation, which revealed [she] sustained rib fractures on her left and right side, which were in the healing stage, hemorrhage of her left eye, a laceration across the entire floor of her mouth, and an abrasion on her cheek. [N.T., 8/19/14, at 11.] Subsequently, doctors admitted A.C. to Hospital.
>
> [The following day, o]n August 4, 2013, DHS spoke to parents at Hospital and parents were unable to provide an explanation for A.C.'s injuries. On August 5, 2013, Mother told DHS that Father frequently squeezed A.C. in an attempt to relieve her body of gas. Mother also explained to DHS that the rib fracture might have happened when A.C. fell off the bed about a month ago or from L.C.['s] sitting on A.C.'s back while playing. Mother stated, to DHS and Dr. [Maria] McColgan ("Doctor"), [the Medical Director of the Child Protection Program at Hospital,[3]] that Father scratched A.C.'s mouth with his fingernail while attempting to insert a pacifier in her mouth. Initially, Mother explained that Father called Mother while she was away from the home and told her that A.C. needed to go to the hospital because Father was unable to stop her mouth from bleeding. However, Doctor testified that when [she] spoke to Mother, Mother told [her] she was at home when the Father reached behind him to put A.C.'s pacifier in her mouth and that is how the laceration happened. Father corroborated Mother's explanation regarding how the incidents occurred. Doctor testified [she] explained to Mother that the type of injury A.C. sustained, posterior rib fractures, were likely from someone squeezing [her] and

---

[2] The trial court's opinion referred to A.C. as "Child #1" and L.C. as "Child #2." **See** Trial Ct. Op., 11/4/14, at 1-7. For ease of discussion, we refer to the children by their initials.

[3] N.T. at 9.

not a result of a direct blow or from a fall. After Doctor gave this explanation, Mother immediately responded, "I knew it was him." [*Id.* at 15.] Mother then stated . . . Father would sometimes try to help A.C.'s stool when she was having trouble by squeezing on her abdomen. [*Id.* at 15, 32-33, 45.] Doctor diagnosed the inflicted injury as [the] result of physical abuse because the injuries A.C. sustained would not have been from just pressing on the abdomen, someone would have to be squeezing the ribcage in order to create the fractures A.C. sustained. Doctor also testified that some of the injuries occurred at separate times. On August 7, 2013, DHS learned that Hospital determined that A.C.'s injuries were non-accidental.

On August 8, 2013, DHS obtained an Order of Protective Custody ("OPC") and the Hospital discharged A.C. and L.C. into the care of their aunt and uncle. On this day, a Safety Plan was implemented in the home of the children's aunt and uncle. The Safety Plan stated that the children's parents were not to have visitation with the children for 21 days and that the aunt and uncle would ensure that the children's basic needs, including medical appointments, were met. On August 9, 2013, a shelter care hearing was held, the OPC was lifted, and the temporary commitment to DHS was ordered to stand.

Trial Ct. Op. at 2-3.

On August 13, 2013, DHS filed separate petitions for A.C. and L.C., for an adjudication of dependency and finding of aggravated circumstances. One year later, on August 19, 2014, the court held a hearing, at which the following witnesses testified: Dr. McColgan, whom Father stipulated was an expert in child abuse, DHS caseworker Lissa Varghese, Father, and Mother.[4]

On August 13, 2013, DHS filed separate petitions, for Child and L.C.,

_____

[4] Mother and Father were represented by different counsel in these proceedings.

- 3 -

for an adjudication of dependency. One year later, on August 19, 2014, the court held a hearing, at which the following witnesses testified: Dr. McColgan, whom Father stipulated was an expert in child abuse, the DHS caseworker, Father, and Mother.

At the hearing, the court found both Child and L.C. dependent,[5] and found Father perpetrated child abuse against Child. N.T. at 66. The trial court found "both parents were the children's primary caregivers" but "found child abuse as to Father only." DHS caseworker Varghese informed the court the parents have, on alternating Saturdays, supervised visits and unsupervised visits. N.T. at 67. She confirmed to the court there were "no issues" with the unsupervised visits. *Id.* at 68. She further advised the court that a family service plan was already "scheduled," both parents completed several training programs,[6] and DHS was awaiting "the results of the parenting capacity evaluation that both parents have completed." *Id.* at 70-71. The parents were also referred to a housing program which "assist[s] parents in locating housing," because "the house is not

---

[5] The Juvenile Act defines a "dependent child" as, *inter alia*, a child who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa.C.S. § 6302(1). Father does not challenge the adjudication of dependency.

[6] Specifically, Father "completed anger management, parenting and healthy relationships." N.T. at 74. Mother "completed parenting, employment services, empowerment group[,] anger management," and "healthy relationships." *Id.* at 73.

appropriate."[7]   *Id.* at 73.   Mother requested additional visitation with the

children.  The trial court denied the request but stated it may reconsider:

> [Court: W]hy don't we just keep it this way until we hear what the parenting capacity recommends, and then we can further discuss any other modifications and refer parents for any other services if need be.
>
> [Counsel for DHS:] And visits can always be—if the order says visits can be modified by agreement of the parties—
>
> [Court:] Okay.
>
> [Counsel for DHS:] I have no problem with that.
>
> [Court:] Visits may be modified by the agreement of the parties.  . . .

N.T. at 76.

On September 15, 2014, Mother timely filed notices of appeal from

L.C.'s and A.C.'s dependency orders, as well as Pa.R.A.P. 1925(a)(2)(i)

concise statements of errors complained of on appeal.[8]   This Court *sua*

*sponte* consolidated the appeals.

---

[7] DHS caseworker Lissa Varghese testified the home was "not safe" because six adults and one child were living in the home in June of 2014, there was "high traffic" and the "children sustain [unexplained] injuries in the home." *Id.* at 35-36.

[8] Subsequently, the trial court found Mother's counsel "did not abide by" Rule 1925 and ordered her to file a supplemental statement.  Trial Ct. Op. at 1.  Counsel complied, but the court found it still "did not concisely identify each ruling or error that Mother intended to challenge" or "state the errors complained of without unnecessary detail."  *Id.*   Nevertheless, the court surmised Mother's claim "to be that the trial court erred in adjudicating the children dependent as to paragraph (1) of the definition of a 'Dependent Child' under 42 Pa.C.S.A. § 6302." *Id.*

On appeal, Mother presents four issues for our review. In her first claim, she argues the trial court abused its discretion or erred as a matter of law in finding Father physically abused A.C. pursuant to 23 Pa.C.S. § 6303(b)(1)(i). Specifically, Mother asserts "the record does not support a finding [that A.C.] suffered severe pain from a non-accidental injury by clear and convincing evidence." Mother's Brief at 11. In support, Mother cites Dr. McColgan's alleged testimony, from a April 2012 "Pennsylvania Task Force on Child Protection Hearing," that "[p]ain is subjective" and that it is difficult to "determine with any certainty the level of pain a 7 week old, a 13 month old or often times even an older child is experiencing."[9] *Id.* at 13. Mother thus asserts "it is . . . clear that [Dr. McColgan] is hesitant to testify under oath as to the [presence] of severe pain," and "[a] careful reading of her entire testimony in this case reveals a lack of evidence for the Court's finding of abuse." *Id.* Mother further avers that although "[i]t is clear that [A.C.'s] injuries were caused by Father's acts[, i]t must be said that he acted out of ignorance." *Id.* at 14. Mother maintains there is no history of him "ever intend[ing] to harm" the children and he made "an unknowing mistake" while "trying to help his child." *Id.* Mother concludes, "Clearly there was no searching inquiry by the Court" as to whether the children were dependent "and the burden was not close to being met." *Id.* at 15. She avers, "The

---

[9] Mother attaches as an exhibit to her brief a six-page report entitled "Commonwealth of Pennsylvkania Task Force on Child Protection: The Definition of Child Abuse," authored by Dr. McColgan and dated April 18, 2012. *See* Mother's Brief, Ex. E.

clear necessity standard for removing the child from her mother is not met as there was no finding or effort made to fashion a lesser remedy," "[f]or example removing the father from the home as the mother is clearly an innocent party to whom no bad behavior can be assigned." *Id.* We find no relief is due.

Our Supreme Court has stated:

> "[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." We review for abuse of discretion.

*Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015) (citation omitted).

> To adjudicate a child dependent, a trial court must determine, by clear and convincing evidence, that the child:
>
>> is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk.
>
> 42 Pa.C.S.A. § 6302. "Clear and convincing" evidence has been defined as testimony that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue."

*In re A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013) (some citations omitted).

Section 6303(b)(1) of the Child Protective Services Law[10] defines "child abuse" in pertinent part as follows:

> (i) Any recent act or failure to act by a perpetrator which causes nonaccidental serious physical injury to a child under 18 years of age.
>
> \*     \*     \*
>
> (iii) Any recent act, failure to act or series of such acts or failures to act by a perpetrator which creates an imminent risk of serious physical injury to or sexual abuse or sexual exploitation of a child under 18 years of age.

23 Pa.C.S. § 6303(b)(1)(i), (iii). "Nonaccidental" is defined as "[a]n injury that is the result of an intentional act that is committed with disregard of a substantial and unjustifiable risk." 23 Pa.C.S. § 6303(a). In addition, "serious physical injury" is defined as "an injury that (1) causes a child severe pain; or (2) significantly impairs a child's physical functioning, either temporarily or permanently." *Id.*

On March 25, 2014, subsequent to the trial court's underlying dependency order, our Supreme Court decided *Interest of L.Z.*, in which it held:

> While a petitioning party must demonstrate **the existence of child abuse by the clear and convincing evidence** standard applicable to most dependency determinations, 42 Pa.C.S. § 6341(c) . . . the **identity of the abuser need only be established through** *prima facie* **evidence** in certain situations[ pursuant to 23 Pa.C.S. § 6381(d).]

---

[10] This version of Section 6303 was effective at the time of the underlying adjudication order. *See* 23 Pa.C.S. § 6303 (valid through December 31, 2014).

*Interest of L.Z.*, 111 A.3d at 1174 (emphases added).

We note the following discussion by the Court:

> [C]hild abuse cases often involve a child presenting to a hospital with significant injuries that are entirely consistent with common types of child abuse and entirely inconsistent with the implausible explanations concocted by the parents and responsible persons to avoid allegations of child abuse. . . . As the children may be too young or fearful to describe the abuse, CYS agencies are left to prove their case with only the physical evidence of injuries that would not ordinarily be sustained but for the action of the parents or responsible persons and the implausible statements of the parents and responsible persons. . . .

*Id.* at 1171.

The Court further held the presumption was rebuttable by the parent:

> The parent or responsible person may present evidence demonstrating that they did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by the CYS agency and the rebuttal of the parent or responsible person.

*Id.* at 1185.

In the case *sub judice*, the trial court opined:

> [Dr. McColgan's] testimony established that the injuries A.C. sustained would not occur by someone just pressing on her abdomen, someone would have to be squeezing the ribcage in order to create the fractures. [N.T. at 15.] The explanations the parents gave, that the fractures were caused either by A.C. falling from a bed or by L.C. sitting on A.C.'s back, are not consistent with the injuries A.C. sustained. [Dr. McColgan] testified that A.C. would have

cried when the event occurred that fractured her ribs. However, Father testified that A.C. did not cry when L.C. was sitting on her back. [*Id.* at 47.] Parents were never able to explain A.C.'s injuries in a way consistent with the type of injuries A.C. sustained. Furthermore, [Dr. McColgan] testified that the type of rib fractures A.C. had are a type of rib fractures that do not occur from an accidental injury. [*Id.* at 26.] A.C. had multiple rib injuries[:] lateral rib fractures and fractures on the left side still in the process of healing. [*Id.* at 13-14.] The rib fractures A.C. had was a serious injury causing significant on-going pain[. *Id.* at 14, 17-18, 27.] Father also testified that in order to relieve A.C. of gas pains, he would push on her abdomen. [*Id.* at 45.] Mother had said that A.C. sometimes cried when the Father squeezed on her abdomen. Father testified that no doctor ever instructed him to push on A.C.'s abdomen to relieve gas pains. [*Id.* at 45. Dr. McColgan] testified that the hemorrhaging in the [left] eye was also from trauma and that an infant, such as A.C., would not be able to self-inflict this type of injury to her own eye. [*Id.* at 16, 18. Dr. McColgan] also testified that the laceration to A.C.'s mouth would not occur from an ordinary fingernail scratch, the laceration was across the entire floor of the mouth and deep under her tongue. Significant amount of force would be required to cause such an injury. [*Id.* at 24.] There [were] six other adults and three other children who live with parents[,] A.C. and L.C. Father testified that no other adult[ ] who lives in the house witnessed the injury to the mouth. [*Id.* at 48.] The injuries A.C. sustained while under the care of her parents could not be explained by her parents, the injuries were serious, and caused A.C. severe pain. [Dr. McColgan] spoke with Mother, and Mother said that Father was the perpetrator of A.C.'s rib fractures by exclaiming "I knew it was him[." *Id.* at 15.]

Trial Ct. Op. at 4-5 (some citations to record omitted).

The testimonial evidence supports the court's findings. Dr. McColgan testified about A.C.'s rib fractures as follows. A.C. "had bilateral fractures of the 11th ribs" which were approximately one to three weeks old at the time

she was examined at St. Christopher's Hospital.  N.T. at 11, 14.  Dr. McColgan testified a rib fracture is "a serious injury.  It would have caused pain to the child." *Id.* at 14.  She elaborated:

> [Dr. McColgan:] This would be significant pain.  [I]t's subjective to be able to determine how much pain someone else experienced.  A rib fracture is a fracture of the bone, which is typically severe pain.
>
> [DHS's counsel:] Would [A.C.] cry?  Would it be likely that she would cry?
>
> A. It would be likely that she would cry.

N.T. at 17-18.  Based on Dr. McColgan's testimony, we discern no abuse of discretion by the court in finding A.C.'s bilateral rib fractures were a "serious physical injury" pursuant to section 6303.[11]  *See* 23 Pa.C.S. § 6303(a).

With respect to whether A.C.'s rib fractures were a "nonaccidental" injury, Dr. McColgan testified as follows:

> [DHS' counsel:] And in your professional opinion, would a four month-old incur these injuries on her own?
>
> [A:] No, these are not self-inflicted injuries.  At four months of age, typically, you're just learning how to roll over, maybe lifting your head, but you would not have enough movement to cause these injuries yourself.
>
> [Q: I]n your professional opinion, is it likely that a four month-old would sustain these injuries without some sort of non-accidental trauma?

---

[11] We reject Mother's reliance on Dr. McColgan's alleged testimony before the Pennsylvania Task Force on Child Protection, as it is not a part of the certified record before us.  *See Hrinkevich v. Hrinkevich*, 676 A.2d 237, 240 (Pa. Super. 1996) ("For purposes of appellate review, what is not of record does not exist.").

- 11 -

[A:] You could have accidental injury, but the accidental injuries that were reported would not have accounted for all of these injuries, nor were they likely to have caused these injuries.

[Q:] Can you say, to a reasonable degree of medical certainty, that [A.C.'s] injuries were caused by child abuse?

[A:] Yes, my diagnosis was physical abuse.

N.T. at 18-19; *see also id.* at 24-25. Based on Dr. McColgan's testimony, we likewise discern no abuse of discretion by the court in finding A.C.'s rib fractures were a "nonaccidental" injury pursuant to section 6303. *See* 23 Pa.C.S. § 6303(a).

In addition, Dr. McColgan testified concerning A.C.'s mouth injury as follows. A.C. had a laceration "across the floor of the mouth, just behind the gum line," as well as "hematoma, which is a collection of blood underneath her tongue." N.T. at 11. This mouth injury was "relatively recent," and A.C. would "have been in pain when she received that injury." *Id.* at 12. Mother's explanation for the injury, that Father caused it by putting a pacifier in her mouth, "should not" have caused it. *Id.* at 13.

Dr. McColgan further testified about A.C.'s hemorrhage in her left eye as follows. It was "a subconjunctival hemorrhage . . . which is a collection of blood in the white portion of the eye." *Id.* at 11. The eye hemorrhage was caused by "trauma":

The white part of the eye—you can sometimes see hemorrhages there, usually from trauma. You can also get them from very severe coughing or very severe vomiting,

- 12 -

> but that's pretty unlikely in . . . an infant, and there was no report of severe vomiting or coughing for [A.C.].

*Id.* at 16. Further, there was no biological or medical reason for A.C.'s eye hemorrhage. *Id.* at 16-17.

Significantly, Dr. McColgan testified A.C. sustained the foregoing injuries in "at least two separate episodes." *Id.* at 19. She stated:

> Some of the injuries had to have occurred at separate times. The rib fracture was, again, a week to [three] weeks old. The scratches on the face and the laceration on the tongue and the eye injury were likely relatively more recent . . . .
>
> So, we know there was at least two separate episodes, but I can't tell you that the face injury, the mouth injury or the eye injury did or didn't happen at the same time.
>
> [Child Advocate:] But they happened separate from the ribs?
>
> [A:] Yes.

*Id.* at 19-20.

Based on the foregoing testimony of Dr. McColgan, as well as Father's and Mother's explanations for A.C.'s injuries, we discern no abuse of discretion by the court in finding A.C. was the victim of "child abuse" perpetrated by Father. *See Interest of L.Z.*, 111 A.3d at 1174. Specifically, we conclude the testimonial evidence demonstrated that A.C.'s bilateral rib injuries satisfied the definition of "child abuse" under section 6303(b)(1)(i). *See* 23 Pa.C.S. § 6303(b)(1)(i). With respect to A.C.'s injuries to her mouth and left eye, we conclude that the testimonial evidence

demonstrates that she suffered "child abuse" under section 6303(b)(1)(iii), as they created "an imminent risk of serious physical injury." As such, Mother's first issue fails.

We address Mother's remaining issues together. Her second claim is that "the trial court abused its discretion and/or erred as a matter of law in concluding [DHS] established by clear and convincing evidence that a dependency existed pursuant to 42 Pa.C.S.A. § 6302[.]" Mother's Brief at 14. She avers, "Clearly there was no searching inquiry by the Court. . . and the burden was not close to being met." *Id.* at 15. Mother further reasons "there was no finding or effort . . . to fashion a lesser remedy . . . by which the child [sic[12]] could remain with her mother[, f]or example removing the father from the home as the mother is clearly an innocent party." *Id.* at 15.

The discussion of Mother's third claim, in sum, is as follows:

> **The trial court erred in finding "clear necessity" that the children be removed from their mother's home.**
>
> [A.C.] had two healing rib fractures which the Parents had no way of knowing about. *See* [N.T. at 23.] Through their cooperation, it can be reasonably determined that they were caused by the Father squeezing the child. Now that the cause is known, there is no evidence to suggest that will ever happen again.

*Id.* at 16.

Mother's final claim is that the "court effectively create[d] a per se rule

---

[12] In the next paragraph of her brief, Mother argues, without reference to her other child A.C., "There is no good reason in this world for removing [L.C.] from her home as the evidence is she has received nothing but the best care for her entire life." *See* Mother's Brief at 16.

of abuse and dependency based solely upon the [presence] of healing rib fractures and the parents['] uncertainty as to when it occurred, contrary to the express language of the Juvenile Act and this Court's established precedent." *Id.* Mother states that in *Interest of J.O.V.* , 686 A.2d 421 (Pa. Super. 1996), "the child was returned to the parents after the discovery of [a] broken rib[, and i]t was only after the child was found to have later suffer[ed] a second such injury without explanation was the child removed from the home." Mother's Brief at 16. Mother then states, "Here, the Parents are now aware of the cause and deserve their second chance." *Id.* We find no relief is due.

We incorporate our analysis above and find no relief is due. The record supports the court's finding of dependency for both children, as the evidence demonstrated A.C. was without proper parental care and control necessary for her physical, mental, or emotional health. *See* 42 Pa.C.S. § 6302. With respect to the older child, L.C., this Court has stated that, in determining whether siblings are also dependent,

> the focus is not on whether the other siblings are actually at risk of abuse themselves. Rather, the key question is whether the siblings fit the broader definition of lacking "proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental or emotional health, or morals." 42 Pa.C.S. § 6302. . . .

*In re M.W.*, 842 A.2d 425, 429 (Pa. Super. 2004); *see also In re S.B.*, 833 A.2d 1116, 1123 (Pa. Super. 2003) (affirming dependency adjudication

of child who, while himself "was not deemed to be abused in the home, his condition and the dysfunction of the home"—where child's sibling was sexually abused by adoptive parent—"are such that the court deemed it necessary that CYS supervise the home").

Furthermore, contrary to Mother's assertion, the court considered her request for additional visitation with the children. Although the court denied it, it stated it would await the result of the parenting evaluation and specifically allowed the parties to modify visitation in the future. We discern no abuse of discretion by the court in adjudicating both A.C. and L.C. dependent and removing them from Mother and Father's home. **_See Interest of J.O.V._** 686 A.2d at 423 (holding trial court did not err in adjudicating child dependent where "[c]lear and convincing evidence was presented which demonstrated that some person, or persons, was harming the defenseless months-old infant," and finding, "The fact that his parents express bewilderment over the genesis of these injuries does not obviate their responsibility."). Accordingly, we affirm the orders adjudicating A.C. and L.C. dependent.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>8/13/2015</u>